REED SMITH LLP
Christopher A. Lynch, Esq.
John B. Berringer, Esq.
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: clynch@reedsmith.com
E-mail: jberringer@reedsmith.com

REED SMITH LLP
Timothy P. Law, Esq. (*pro hac vice* pending)
1717 Arch Street
Three Logan Square, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-mail: tlaw@reedsmith.com

*Proposed Special Insurance Counsel for
Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| The Roman Catholic Diocese of Rockville Centre, New York,<br><br>Debtor. | Case No. 20-12345-scc |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,<br><br>Plaintiff,<br>against<br><br>ARROWOOD INDEMNITY COMPANY fka Royal Insurance Company, also fka Royal Globe Insurance Company; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON & CERTAIN LONDON MARKET COMPANIES namely Allianz International Ltd., Ancon Insurance Co. (UK) Ltd., Assicurazioni Generali T.S., British National Insurance Co. Ltd. formerly known as British National Life Insurance Society Ltd., CX Reinsurance Co. Ltd. formerly known as C.N.A. Re of London, Compagnie d'Assurance Maritimes et Terrestres now known as Allianz Global Corporate & Specialty (France), Dominion Insurance Co. Ltd., Excess Insurance Co. Ltd., Lexington Insurance Co., London & Edinburgh General Insurance Co. Ltd., Sovereign Marine & General Insurance Co. Ltd., St. Katherine Insurance Co. Ltd., Storebrand Insurance Ltd., Taisho Marine & Fire (UK) Ltd., Terra Nova Insurance Co. Ltd., Tokio Marine & Fire | Adv. Pro. No. 20-_____<br><br>**ADVERSARY PROCEEDING COMPLAINT** |

(UK) Ltd., Turegum Insurance Co. Ltd., Unionamerica
Insurance Co. Ltd. and Yasuda Fire & Marine (UK) Ltd.;
ALLIANZ UNDERWRITERS INSURANCE COMPANY;
ASSOCIATED INTERNATIONAL INSURANCE
COMPANY; COLONIAL PENN INSURANCE
COMPANY; FIREMAN'S FUND INSURANCE
COMPANY; INTERSTATE FIRE & CASUALTY
COMPANY, NATIONAL SURETY CORPORATION and
DOE INSURANCE COMPANIES 1 through 10,

                    Defendants.

Plaintiff the Roman Catholic Diocese of Rockville Centre, New York (the "Diocese"), by and through its attorneys, brings this Adversary Proceeding Complaint against Arrowood Indemnity Company ("Arrowood"), Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies as further described herein including, at least, Allianz International Ltd., Ancon Insurance Co. (UK) Ltd., Assicurazioni Generali T.S., British National Insurance Co. Ltd. formerly known as British National Life Insurance Society Ltd., CX Reinsurance Co. Ltd. formerly known as C.N.A. Re of London, Compagnie d'Assurance Maritimes et Terrestres now known as Allianz Global Corporate & Specialty (France), Dominion Insurance Co. Ltd., Excess Insurance Co. Ltd., Lexington Insurance Co., London & Edinburgh General Insurance Co. Ltd., Sovereign Marine & General Insurance Co. Ltd., St. Katherine Insurance Co. Ltd., Storebrand Insurance Ltd., Taisho Marine & Fire (UK) Ltd., Terra Nova Insurance Co. Ltd., Tokio Marine & Fire (UK) Ltd., Turegum Insurance Co. Ltd., Unionamerica Insurance Co. Ltd. and Yasuda Fire & Marine (UK) Ltd. (the "London Market Insurers" or "LMI") and against domestic insurance companies Allianz Underwriters Insurance Company, Associated International Insurance Company, Colonial Penn Insurance Company, Fireman's Fund Insurance Company, Interstate Fire & Casualty Company and National Surety Corporation (collectively, the "Insurers"), and alleges as follows:

2

## BACKGROUND

1.    This is a civil action for declaratory judgment and breach of contract relating to insurance coverage for claims and lawsuits alleging that the Diocese was negligent in failing to prevent childhood sexual abuse by certain members of the clergy.  Under binding New York precedent, allegations of negligence in hiring or retaining an employee who commits a sexual assault constitute an "occurrence" that is not excluded by an "expected or intended" exclusion and is covered by standard general commercial liability insurance policies.

2.    On February 14, 2019, Governor Andrew Cuomo of New York signed into law the Child Victims Act ("CVA").  The CVA revives liability for claims based on sexual abuse that were previously barred by the statute of limitations, opening a "window" for claimants to commence civil actions alleging sexual abuse from many years ago.  The "window" for bringing lawsuits opened in August 2019.

3.    Pursuant to the CVA, dozens of individuals have brought claims alleging negligence against the Diocese and various entities of the Diocese, such as parishes and schools, in relation to alleged sexual abuse (the "Underlying Lawsuits").  Prior to the enactment of the CVA, the Diocese had already undertaken significant efforts to address allegations of sexual abuse, including creating its Independent Reconciliation and Compensation Program ("IRCP") independently administered by Kenneth Feinberg.

4.    Although the Insurers have acknowledged some liability to the Diocese, the Insurers have  not paid the settlements reached in the IRCP and have disputed, limited, and/or denied coverage in ways that are contrary to their insurance policies, as well as New York law and precedent.  In this proceeding, the Diocese seeks a declaratory judgment of its rights under the relevant insurance policies and the recovery of amounts owed under those insurance policies.

## THE PARTIES

5.      The Diocese is a religious corporation formed by an act of the legislature of New York State and has its principal place of business in the State of New York. Its territory comprises the counties of Nassau and Suffolk.

6.      Upon information and belief, Defendant Arrowood Indemnity Company ("Arrowood") was formerly known as Royal Insurance Company, Royal Indemnity Company and Royal Globe Insurance Company and is an insurance company organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina. Arrowood is responsible as successor in interest to Royal Insurance Company, Royal Indemnity Company and Royal Globe Insurance Company to meet all of the obligations of those companies under certain insurance policies identified on Exhibit A.

7.      The London Market Insurers subscribed to certain insurance policies identified on Exhibit A. Lloyd's of London is a market for the buying and selling of insurance risk among its members, or "names," who can be individual underwriters and who may be bound together in syndicates and with insurance companies which participate in the Lloyd's market.

8.      Those Certain London Market Insurance Companies exist under the laws of the United Kingdom and other foreign sovereigns with principal places of business in London, England. On information and belief, those Certain London Market Insurance Companies which sold or subscribed to the insurance policies listed on Exhibit A include at least, Allianz International Ltd., Ancon Insurance Co. (UK) Ltd., Assicurazioni Generali T.S., British National Insurance Co. Ltd. formerly known as British National Life Insurance Society Ltd., CX Reinsurance Co. Ltd. formerly known as C.N.A. Re of London, Compagnie d'Assurance Maritimes et Terrestres now known as Allianz Global Corporate & Specialty (France), Dominion Insurance Co. Ltd., Excess Insurance Co. Ltd., Lexington Insurance Co., London & Edinburgh

4

General Insurance Co. Ltd., Sovereign Marine & General Insurance Co. Ltd., St. Katherine Insurance Co. Ltd., Storebrand Insurance Ltd., Taisho Marine & Fire (UK) Ltd., Terra Nova Insurance Co. Ltd., Tokio Marine & Fire (UK) Ltd., Turegum Insurance Co. Ltd., Unionamerica Insurance Co. Ltd. and Yasuda Fire & Marine (UK) Ltd.  Accordingly, pursuant to 28 U.S.C. §1332(c)(1), the London Market Insurers are citizens of the United Kingdom or another foreign sovereign and, by the terms of their policies, have consented to the jurisdiction of this Court, have agreed to comply with all requirements necessary to give this Court jurisdiction and further agreed that all matters pertinent to this lawsuit shall be determined by this Court.

9.     Defendant Allianz Underwriters Insurance Company ("Allianz Underwriters") is an insurance company organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  At all times pertinent, Allianz Underwriters was insuring risks and doing and conducting business in the State of New York.

10.     Defendant Associated International Insurance Company ("Associated International") is an insurance company organized under the laws of the State of Illinois with its principal place of business in Deerfield, Illinois.  At all times pertinent, Associated International was insuring risks and doing and conducting business in the State of New York.

11.     Defendant Colonial Penn Insurance Company ("Colonial Penn") is an insurance company organized under the laws of the State of Massachusetts with its principal place of business in Norristown Pennsylvania.  At all times pertinent, Colonial Penn was insuring risks and doing and conducting business in the State of New York.

12.     Defendant Fireman's Fund Insurance Company ("Fireman's Fund") is an insurance company organized under the laws of the State of California with its principal place of business in

Chicago, Illinois.  At all times pertinent, Fireman's Fund was insuring risks and doing and conducting business in the State of New York.

13.     Defendant Interstate Fire & Casualty ("Interstate") is an insurance company organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  At all times pertinent, Interstate was insuring risks and doing and conducting business in the State of New York.

14.     Defendant National Security Corporation ("NSC") is an insurance company organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.  At all times pertinent, NSC was insuring risks and conducting business in the State of New York.

15.     Defendants Doe Insurance Companies 1 through 10 are insurance companies which issued or subscribed to insurance policies listed on Exhibit A and which have not been identified at the present time or are insurance companies which issued or subscribed to insurance policies not listed on Exhibit A but which policies insure or potentially insure the risks at issue herein and which have not been identified or located.

16.     In addition to the Insurers, the following companies:  Bellefonte Insurance Co., Centennial Insurance Co., Folksam International (UK) Ltd., Heddington Insurance Co. (UK) Ltd., Mentor Insurance (UK) Ltd., Midland Insurance Co., North Atlantic Insurance Ltd., Pine Top Insurance Co., Sphere Drake Insurance PLC, and Stronghold Insurance Ltd. (the "Non-viable Insurers") also subscribed to or sold policies of insurance covering the Diocese but the Non-viable Insurers are in liquidation, closed, defunct, insolvent or otherwise unavailable to perform the insuring obligations for which they contracted at policy issuance and, as such, actions to recover under the Non-viable Insurers' policies are stayed by Court orders.

6

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this adversary proceeding pursuant to sections 157

and 1334 of title 28, United States Code.  Venue is proper pursuant to sections 1408 and 1409 of

title 28, United States Code.  This Adversary Proceeding is a core proceeding pursuant to sections

157(b)(2)(A) and (O) of title 28, United States Code, and the Court may enter a final judgment as

to the merits of this case.

18.     The Diocese currently has over 200 lawsuits pending against it under the CVA, and

the insurance policies at issue are the Diocese's primary assets for addressing those lawsuits.

Determining the rights of the Diocese and the obligations of the Insurers is at the heart of the

Diocese's reorganization proceeding and should be determined by this Court.

## LIABILITY INSURANCE POLICIES PURCHASED BY THE DIOCESE

19.     From at least 1957, when the Diocese was formed, to 1986, in consideration of

premiums paid by or on behalf of the Diocese, the Insurers sold or acquired responsibility for

general liability insurance policies, including, at times, primary, umbrella and excess liability

insurance policies including, at least, those policies listed on the attached Exhibit A (collectively,

the "Insurance Policies").  The Insurance Policies provide coverage for the Diocese and the DRVC

Related Parties, which are incorporated parishes, schools, and other Roman Catholic entities which

lie within the Diocese's territory.

20.     The Insurance Policies provide coverage for damages that the Diocese and other

insureds become legally obligated to pay through judgments or settlements because of bodily

injury, including settlements or judgments based on claims and lawsuits alleging sexual and

physical abuse.

21.     The Insurance Policies also require the Insurers to pay or indemnify the Diocese

for defense costs and expenses, including attorney's fees incurred by the Diocese and the DRVC

Related Parties in the investigation and defense of suits brought against the Diocese and DRVC Related Parties under the CVA by victim-survivors.

22.     From 1957 to 1976, the Diocese purchased primary and, at times, umbrella insurance policies from Arrowood's predecessors (the "Royal Policies"). The Royal Policies insure the Diocese and the DRVC Related Parties. The Royal Policies include a duty to defend lawsuits against the insureds and a duty to indemnify settlements and judgments for claims and lawsuits against the insureds.

23.     From 1976 to 1986, the Diocese purchased insurance policies from the London Market Insurers. The policies sold by LMI (the "LMI Policies") cover the Diocese and the DRVC Related Parties. The LMI Policies consist of a program of insurance policies that insures the Diocese's losses above a Self-Insured Retention ("SIR") amount that is paid by the Diocese. The per occurrence limit of the SIR is $100,000 and there is an annual aggregate SIR limit that was calculated each year and ranged from $1,200,000 in 1976 to $4,500,000 in 1986. The annual aggregate SIR limit was the maximum amount the Diocese would pay for losses and expenses in each policy period before an Aggregate Agreement with the LMI was triggered.

24.     When any claim exceeds the per occurrence limit of the SIR, the LMI Policies provide an initial layer of insurance over the SIR under the "Specific Excess Agreement" in those insurance policies.

25.     The Specific Excess Agreement provides limits of liability for any loss that exceeds the $100,000 SIR. There is no aggregate limit that applies to the Specific Excess Agreement. From 1976 to 1977, the Specific Excess limit was $100,000 per occurrence. In 1977, the Specific Excess limit was raised to $200,000 per occurrence. Then, in 1978 the Specific Excess went back to $100,000 per occurrence through September 1, 1986.

26.     There is a second insuring agreement in the initial layer of insurance over the SIR, the "Aggregate Agreement."   The Aggregate Agreement insures the SIR when the Diocese has satisfied its annual aggregate SIR limit.  When the Diocese has paid the annual aggregate SIR limit in any policy period, the Aggregate Agreement assumes payment of the per occurrence SIR limit until the Aggregate Agreement's own aggregate limit is reached.  The Aggregate Agreement aggregate was $500,000 per year until 1982 when it increased to $1,000,000 per year through 1986.  Once the Aggregate Agreement aggregate is satisfied, responsibility for satisfying future SIRs reverts to the Diocese.

27.     At this time, the annual aggregate SIR limit has been paid in full for the policy periods beginning in 1976, 1981, 1983 and 1984.  For 1978 and 1982, the unpaid annual aggregate SIR limits are less than the single per occurrence SIR.

28.     The Diocese is currently owed in excess of $83,000 under the Aggregate Excess Agreement, which LMI has refused to pay despite due demand.

29.     In addition to indemnity coverage for claims and suits, the LMI Policies cover the losses and expenses incurred in the "litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered" under the LMI Policies. The losses and expenses are paid from the per occurrence limits of the LMI Policies.

30.     A sexual abuse exclusion was added to the Diocese's insurance policies sold by the London Market Insurers that incepted in 1986 which eliminated coverage under those insurance policies for purposes of this Adversary Proceeding.

31.     From 1978 to 1986, the Diocese also purchased insurance policies from Interstate. Each Interstate insurance policy covered all losses and expenses incurred as a consequence of each occurrence up to the policy limits when the underlying SIR and LMI limits have been paid.  For

instance, certain Interstate insurance policies state that the "Company Limits" are the "[d]ifference between underlying including self insured retention (combined total of which $200,000.00 General Liability, Error's [sic] and Omissions liability and Auto Liability any one occurrence except Worker's Compensation $150,000.00 any one occurrence) and $5,000,000.00 General Liability, Errors and Omissions liability and Auto Liability and Worker's Compensation Combined any occurrence."  Other Interstate insurance policies may have different amounts of Company Limits.

32.     In the 1985 policy year, Colonial Penn sold an insurance policy to insure the difference between the 1985 Interstate policy limit and the LMI excess program described below.

33.     When the Interstate per occurrence limit, or in 1985 the Colonial Penn per occurrence limit, is exhausted by payment of loss and expense, the LMI excess insurance program attaches.  The LMI excess insurance program contains excess liability insurance policies that "follow form" to the underlying coverage including coverage for losses and expenses up to the limits of liability for each LMI excess insurance policy.  The LMI excess insurance policies are listed on Exhibit A.  The LMI excess insurance program has total per occurrence limits ranging from $15,000,000 to $45,000,000 in excess of the $5,000,000 underlying limits of the Interstate and Colonial Penn insurance policies.

34.     The Fireman's Fund high level excess insurance program provides limits of $50,000,000 per occurrence in excess of the LMI excess insurance program for the policy periods that incept in 1982 and 1983.

35.     On information and belief, Associated International sold an insurance policy that was equivalent to and preceded the Interstate insurance policy under the Company Limits provision cited above.

36.     The Diocese timely paid all premiums due under the Insurance Policies and met all its other obligations under the Insurance Policies.

## THE IRCP

37.     In or about 2017, the Diocese created the IRCP as part of its ongoing efforts to bring healing and provide compensation to the victim-survivors who suffered sexual abuse as a minor by a clergy of the Diocese.

38.     The program has been independently administered by Mr. Kenneth Feinberg.  Mr. Feinberg and his colleagues have complete autonomy in determining eligibility, assessing the allegations, and determining compensation for participating victim-survivors, and the Diocese has abided by their determinations.

39.     Pursuant to the IRCP, the Diocese has paid approximately $60 million in claims that could otherwise have been reopened pursuant to the CVA.

## CVA AND SEXUAL ABUSE CLAIMS

40.     The CVA allows claimants to file suits alleging sexual abuse that were previously barred by the statute of limitations by reopening the statute of limitations for a limited period.  The "window" for the filing of such claims in New York opened in August 2019.

41.     Since August 2019, nearly 200 claimants have filed lawsuits alleging that the Diocese was negligent in various ways, and the Diocese faces substantial potential liability for damages to compensate for bodily injury resulting from the sexual and physical abuse alleged by those claimants.

42.     On September 12, 2019, the Department of Financial Services of the State of New York issued Insurance Circular No. 11 advising insurance companies that the Department expected insurance companies to cooperate fully with the intent of the CVA, to act promptly and in utmost good faith with their prior and current policyholders in relation to claims brought under the CVA,

and reminded insurance companies that Section 2110 of the Insurance Law provides that those licensed under Article 21 may have their licenses suspended or revoked on the grounds that such licensees intentionally misrepresented the terms of an actual or proposed insurance contract or demonstrated untrustworthiness.

## ARROWOOD'S COVERAGE POSITIONS

### Refusal to Defend Entire Action When Some Claims Are Potentially Covered

43.     Under New York law, if there is any potential coverage under a liability insurance policy with a duty to defend regarding a complaint, the insurance company must defend the entire action, even where some of the claims are covered and others are not.  If any of the claims against the insured arguably arise from covered events, the insurance company is required to defend the entire action.  Pursuant to this New York authority, if *any* of the claims against the Diocese in a particular action arguably arise from covered events, Arrowood is required to defend the ***entire action***, not some subset, portion, or allocated share of the action.

44.     In some instances, Arrowood acknowledged a duty to defend some allegations, but denied a duty to defend other allegations, and unilaterally declared that it would only pay an allocated share of defense costs rather than assuming its full duty to defend.  One example of such a declination was made in a letter dated February 6, 2020, relating to the *[Name Withheld] v. Diocese of Rockville Centre, et al.*, Index No. 0900064/2019, matter.  Arrowood agreed that the Diocese is owed a defense, but then purported to limit that defense to certain allegations.

45.     By letter, the Diocese raised the issue with Arrowood, asked it to change its position and assume the full defense, but Arrowood failed to respond, assume the full defense of such claims, or otherwise agree to cure its breach.

46.     Accordingly, the Diocese seeks a declaration that Arrowood has a duty to defend the *entire* action when *any* claims against the Diocese are *potentially* covered, even if other claims or allegations would be, or could be, uncovered.

## Reliance Upon Materials Outside the Underlying Complaints to Deny Duty to Defend

47.     It is well-established under New York law that a liability insurance company has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even if facts outside the four corners of those pleadings might indicate that the claim may be meritless or not covered.  An insurance company cannot look beyond the complaint's allegations to avoid its obligation to defend.

48.     One example of a case in which Arrowood relied upon material extraneous to the complaint is set forth in its letter dated February 6, 2020, relating to the *[Name Withheld] v. Diocese of Rockville Centre, et al.* matter.  Arrowood relied upon materials outside of that complaint to purport to limit its defense obligation.

49.     By letter, the Diocese raised the issue with Arrowood, asked it to change its position and assume the full defense, but Arrowood failed to respond, assume the full defense of such claims, or otherwise agree to cure its breach.

50.     Accordingly, the Diocese seeks a declaration that Arrowood may not rely upon materials outside of the underlying complaints to deny or limit its duty to defend.

## Reasonable Expense of Independent Counsel

51.     The Diocese selected Jones Day as independent counsel to defend the Underlying Lawsuits, consistent with its rights under New York law, which has long protected a policyholder's right to select independent counsel when there is a conflict of interest between the policyholder and its insurance company.

52.     Under New York law, when the policyholder has the right to independent counsel, the insurance company is liable for the payment of the reasonable value of the services of whatever attorneys the policyholder selects.

53.     Arrowood has not agreed to pay the reasonable value of Jones Day's services, instead purporting to limit its obligations to very low hourly rates that are mandated nowhere in the insurance policy, thereby leaving the Diocese to pay Jones Day largely without reimbursement from Arrowood even where Arrowood has acknowledged its duty to defend.

54.     When determining the reasonableness of a law firm's rates, courts examine the market rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation and do not look to whether the insurance company could hire someone else to handle the representation at a lower hourly rate.

55.     The Diocese seeks a declaratory judgment that Arrowood owes a duty to pay the full amount of defense costs incurred and paid for by the Diocese, which is the reasonable value of services of independent counsel for the Underlying Lawsuits, and damages for Arrowood's failure to fulfill that duty.

## Denial of the Duty of Defend

56.     Arrowood denied its duty to defend certain Underlying Lawsuits under the Royal Policies, contending that, despite the claims of negligence against the Diocese, there is no covered "occurrence."

57.     For example, Plaintiff G.C. brought a lawsuit against the Diocese and St. Joseph's Parish Old Roman Catholic Church ("St. Joseph's Parish"), captioned G.C. v. Diocese of Rockville Centre, et al., Supreme Court of the State of New York, County of Nassau, Index No. 900035/2019 (the "G.C. Lawsuit").

58.     G.C. brings two claims in the G.C. Lawsuit, both sounding in negligence and neither alleging that the Diocese or St. Joseph's Parish intentionally caused harm to G.C.

59.     The G.C. Lawsuit alleges bodily injury including "severe and permanent psychological, emotional and physical injuries, shame, humiliation and the inability to lead a normal life" which was "a direct and proximate result of the Church's negligence" (G.C. Complaint ¶ 44) and/or "of the Diocese's negligence" (G.C. Complaint ¶ 55).

60.     G.C. alleges that the Diocese and St. Joseph's Parish owed G.C. a duty of reasonable care "to protect the safety, care, well-being and health of the Plaintiff while he was under the care, custody or in the presence of St. Joseph's Parish (G.C. Complaint, ¶ 39) or the Diocese (G.C. Complaint ¶ 50).

61.     The G.C. Lawsuit alleges that St. Joseph's Parish and the Diocese breached those duties "by failing to protect Plaintiff from sexual assault and lewd and lascivious acts" and was therefore negligent for letting Father Ferraro serve as priest in the church and the Diocese where he would have easy access to boys to abuse (G.C. Complaint ¶¶ 40, 51).

62.     The G.C. Lawsuit further alleges that St. Joseph's Parish and the Diocese "knew or should have known of Father Ferraro's propensity to sexually abuse minor boys," (G.C. Complaint ¶¶ 41, 52), thereby alleging that the Diocese and/or St. Joseph's Parish either knew of Father Ferraro's dangerous propensities and was negligent to retain him or did not know of Father Ferraro's dangerous propensities, but should have known, and were therefore negligent in failing to discover his dangerous propensities.

63.     The G.C. Lawsuit alleges that the Diocese and St. Joseph's Parish can be held responsible for negligence even if they did not have any actual knowledge of Father Ferraro's

dangerous propensities.  If that theory of liability were to succeed at trial, there would clearly be an "occurrence" and the Royal Policies would provide coverage.

64.     Under well-established New York law, the duty to defend arises whenever the pleadings allege an act or omission potentially within the insurance policy's coverage.

65.     Because the allegations within the four corners of the G.C. Complaint potentially give rise to a covered claim, Arrowood is obligated to defend the entire G.C. Lawsuit.

66.     In breach of its obligations, Arrowood has disclaimed its obligation to defend the G.C. Lawsuit.

67.     Accordingly, the Diocese seeks a declaratory judgment that Arrowood has a duty to defend and a duty to indemnify the Diocese in all the Underlying Lawsuits, including, among others, the G.C. Lawsuit, under insurance policies sold by Arrowood to the Diocese for various policy periods from October 1, 1957 to October 1, 1976, and damages for Arrowood's failure to fulfill those obligations.

### Defense of Parishes, Schools, and Other Entities of the Diocese

68.     In some instances, Arrowood has disclaimed a duty to defend the DRVC Related Parties (parishes, schools, and other entities) when they are sued in the Underlying Lawsuits, claiming that there is insufficient evidence that the DRVC Related Parties were insured under the relevant insurance policies.

69.     In other instances, Arrowood has agreed to pay independent counsel for the defense of the DRVC Related Parties, but at a reduced rate.

70.     Testimony of Arrowood's predecessor's employee in a prior action reveals that all of the Diocese's parishes were insured under the Royal insurance policies, and absent evidence to the contrary, this should be accepted as true.

16

71.     The DRVC Related Parties are entitled to separate counsel, and to the extent the Diocese has paid for those attorneys, the Diocese has standing to recover those defense costs and expenses.

72.     Implicit in the duty to defend is the appointment of counsel that is competent as well as free of conflicts or divided loyalties.  The Diocese and DRVC Related Parties are entitled to a separate defense.  The Diocese asserted its right to conflict-free counsel solely dedicated to the defense of the Diocese, and it has not consented to joint representation because the interests of the DRVC Related Parties and Diocese may diverge.

73.     Accordingly, the Diocese seeks a declaratory judgment that Arrowood owes a duty to pay the reasonable value of services of independent counsel to represent the DRVC Related Parties when they are sued.

**Indemnification for IRCP Settlements**

74.     Following the enactment of the CVA, the Diocese continued to settle sexual abuse claims in the IRCP which would otherwise have been subject to the reopening of the statute of limitations brought about by the CVA.

75.     The settlement of these claims benefitted the Insurers by reducing defense costs and effecting an early settlement of claims without the commencement of civil litigation.

76.     Upon information and belief, the Insurers have or will refuse to indemnify the Diocese for these IRCP payments.

77.     Accordingly, the Diocese seeks a declaratory judgment that the Insurers have a duty to indemnify the Diocese for these IRCP payments.

### LMI's Disclaimer of Any Present Duty to Indemnify
### the Diocese for Its Ultimate Net Loss

78.     In its insurance policies, the London Market Insurers agreed to indemnify the Diocese for its Ultimate Net Loss in connection with claims covered under the LMI Policies.  This included amounts incurred by the Diocese in the defense of covered claims, as well as amounts paid by the Diocese in settlements or judgments paid by the Diocese in connection with covered claims

79.     LMI has taken the position that its duty to indemnify the Diocese for its Ultimate Net Loss does not commence until an underlying claim is settled or a judgment against the Diocese for the payment of damages is rendered and becomes enforceable.  LMI has also taken the position that defense costs in an action which is dismissed without payment by the Diocese are not part of Ultimate Net Loss and therefore are not subject to indemnification by LMI.

80.     These positions are contrary to New York law and the prior course of conduct of the parties.

81.     Accordingly, the Diocese seeks a Declaratory Judgment that LMI owes a duty to indemnify the Diocese for defense costs as they are incurred, and that LMI owes a duty to indemnify the Diocese for defense costs in connection with covered claims which are dismissed without payment by the Diocese.

### COUNT I

### Declaratory Judgment Against All Insurers – Sexual Abuse Claims

82.     The Diocese repeats and realleges the contentions set forth in paragraphs 1 through 81, above.

83.     The Diocese seeks a judicial determination of the rights and duties of the Diocese and the Insurers with respect to an actual controversy arising out of the Insurance Policies.

84.     Pursuant to the terms of the Insurance Policies, the Insurers agreed to provide coverage for defense costs and expenses and/or for damages because of bodily injury.

85.     The claims and lawsuits alleging sexual abuse and physical abuse asserted against the Diocese as a result of the CVA, and the significant potential liability arising out of such claims and lawsuits, implicate the Insurance Policies, including the primary, umbrella and excess Insurance Policies.

86.     An actual controversy of a justiciable nature presently exists between the Diocese and the Insurers regarding the proper construction of the Insurance Policies and the rights and obligations of the parties thereto under New York law.  The controversy is of sufficient immediacy and magnitude to justify the issuance of a declaratory judgment.

87.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT II

### Breach of Contract

88.     The Diocese repeats and realleges the contentions set forth in paragraphs 1 through 81, above.

89.     Insurers entered into binding insurance policy contracts with the Diocese, which are the Insurance Policies identified in Exhibit A.

90.     Under their insurance policy contracts, Insurers owe a duty to defend the Diocese from potentially covered lawsuits or owe a duty to pay the defense costs and expenses in such lawsuits as they are incurred and billed.

91.     In violation of their contractual obligations, defendants Arrowood and LMI have failed and refused to defend the Diocese in claims and lawsuits alleging sexual and/or physical

abuse, and/or have disclaimed any obligation to indemnify the Diocese for any judgments or settlements.

92.    The Diocese has suffered damages on account of the Insurers' breaches of their contractual obligations to defend and indemnify the Diocese for the underlying CVA actions.

## COUNT III

### Breach of Contract

93.    The Diocese repeats and realleges the contentions set forth in paragraph 1 through 81, above.

94.    Defendant LMI currently owes the Diocese approximately $83,000 under the Aggregate Excess agreement in its insurance policies as reimbursement for sums expensed by the Diocese for other claims during the period prior to the enactment of the CVA.

95.    Since the enactment of the CVA, additional sums have been expensed by the Diocese in the defense of CVA claims as to which Defendant LMI has as contractual obligation to indemnify the Diocese under the Aggregate Excess agreement.

96.    Defendant LMI has failed and refused to fulfill its contractual obligations to reimburse the Diocese under the Aggregate Excess agreement.

97.    The Diocese has suffered damages on account of Defendant LMI's breach of its contractual obligations under the Aggregate Excess agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, the Diocese prays for judgment as follows:

1.      The Diocese requests that this Court enter a declaratory judgment in favor of the

Diocese against each of the Insurers, declaring that:

(a)      Arrowood has a duty to defend the entire action when any claims against the Diocese are potentially covered;

(b)      Arrowood may not rely upon materials outside of the Complaint to deny or limit its duty to defend;

(c)      Arrowood has a duty to pay the full amount of Jones Day defense costs incurred and paid by the Diocese;

(d)      Arrowood has an obligation to defend and indemnify the Diocese in all the Underlying Lawsuits, including, among others, the G.C. Lawsuit;

(e)      Arrowood owes a duty to pay the reasonable value of services of independent counsel to represent the DRVC Related Parties in the Underlying Lawsuits;

(f)      The Insurers have a duty to indemnify the Diocese for IRCP settlements paid by the Diocese subsequent to the enactment of the CVA;

(g)      LMI owes a duty to indemnify the Diocese for its defense costs in the Underlying Lawsuits as they are incurred, and to indemnify the Diocese for defense costs incurred by the Diocese in connection with Underlying Lawsuits dismissed without payment by the Diocese.

(h)      LMI owes a duty to reimburse the Diocese for defense costs, judgments and/or settlements triggering LMI's duty to reimburse under the Aggregate Excess Agreement.

2.      The Diocese requests an award of compensatory and consequential damages for

Insurers' breaches of contract, along with pre-judgement interest, post-judgment interest, and

attorneys' fees.

3.      Additionally, the Diocese requests such other and further relief as this Court may

deem just and proper.

Dated: New York, New York
       October 1, 2020

REED SMITH LLP

*/s/ Christopher A. Lynch*
Christopher A. Lynch, Esq.
John B. Berringer, Esq.
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: clynch@reedsmith.com
E-mail: jberringer@reedsmith.com

-and-

REED SMITH LLP
Timothy P. Law, Esq. (*pro hac vice* pending)
1717 Arch Street
Three Logan Square, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-mail: tlaw@reedsmith.com

*Proposed Special Insurance Counsel for
Debtor and Debtor in Possession*

**Exhibit A**

| Insurer | Policy No. | Policy Period | | |
|---------|-----------|---------------|---|---|
| Allianz Underwriters | AXL5206661 | 9/1/1985 | - | 10/22/1986 |
| Associated International | AEL050530 | 1/18/1978 | - | 10/1/1978 |
| Colonial Penn | XL150029 | 9/1/1985 | - | 9/1/1986 |
| Fireman's Fund | XLX1395363 | 10/1/1982 | - | 9/1/1983 |
| Fireman's Fund | XLX1395219 | 9/1/1983 | - | 9/1/1984 |
| Interstate | 183-152625 | 10/1/1978 | - | 10/1/1979 |
| Interstate | 183-152625 | 10/1/1979 | - | 10/1/1980 |
| Interstate | 183-152625 | 10/1/1980 | - | 10/1/1981 |
| Interstate | 183-152625 | 10/1/1981 | - | 10/1/1982 |
| Interstate | 83-0169764 | 10/1/1982 | - | 10/1/1983 |
| Interstate | 83-0169764 | 10/1/1983 | - | 9/1/1984 |
| Interstate | 83-0170072 | 9/1/1984 | - | 9/1/1985 |
| Interstate | 83-0172315 | 9/1/1985 | - | 9/1/1986 |
| LMI | SL3152 | 10/1/1976 | - | 10/1/1977 |
| LMI | SLC5163 | 10/1/1976 | - | 10/1/1977 |
| LMI | MW 23017 | 10/1/1976 | - | 10/1/1977 |
| LMI | SL3161 | 10/1/1976 | - | 10/1/1977 |
| LMI | SLC5172 | 10/1/1976 | - | 10/1/1977 |
| LMI | SL3162 | 10/1/1976 | - | 10/1/1977 |
| LMI | SLC5173 | 10/1/1976 | - | 10/1/1977 |
| LMI | SL3152 | 10/1/1977 | - | 10/1/1978 |
| LMI | SLC5163 | 10/1/1977 | - | 10/1/1978 |
| LMI | SL3311 | 1/18/1978 | - | 10/1/1978 |
| LMI | SLC5334 | 1/18/1978 | - | 10/1/1978 |
| LMI | SL3294 | 1/18/1978 | - | 10/1/1978 |
| LMI | SLC5330 | 1/18/1978 | - | 10/1/1978 |
| LMI | SL3152 | 10/1/1978 | - | 10/1/1979 |
| LMI | SLC5163 | 10/1/1978 | - | 10/1/1979 |
| LMI | SL3311 | 10/1/1978 | - | 10/1/1979 |
| LMI | SLC5334 | 10/1/1978 | - | 10/1/1979 |
| LMI | SL3445 | 10/1/1978 | - | 10/1/1979 |
| LMI | SLC5462 | 10/1/1978 | - | 10/1/1979 |
| LMI | SL3452 | 10/1/1978 | - | 10/1/1979 |
| LMI | SLC5469 | 10/1/1978 | - | 10/1/1979 |
| LMI | SL3463 | 10/1/1978 | - | 10/1/1979 |
| LMI | SLC5480 | 10/1/1978 | - | 10/1/1979 |
| LMI | SL3574 | 10/1/1979 | - | 10/1/1980 |
| LMI | SLC5630 | 10/1/1979 | - | 10/1/1980 |
| LMI | SL3606 | 10/1/1979 | - | 10/1/1980 |
| LMI | SLC5656 | 10/1/1979 | - | 10/1/1980 |
| LMI | SL3607 | 10/1/1979 | - | 10/1/1980 |
| LMI | SLC5657 | 10/1/1979 | - | 10/1/1980 |
| LMI | SL3608 | 10/1/1979 | - | 10/1/1980 |

| Insurer | Policy No. | Policy Period |
|---------|------------|---------------|
| LMI | SLC5658 | 10/1/1979  -  10/1/1980 |
| LMI | SL3574 | 10/1/1980  -  10/1/1981 |
| LMI | SLC5630 | 10/1/1980  -  10/1/1981 |
| LMI | SL3606 | 10/1/1980  -  10/1/1981 |
| LMI | SLC5656 | 10/1/1980  -  10/1/1981 |
| LMI | SL3725 | 10/1/1980  -  10/1/1981 |
| LMI | SLC5746 | 10/1/1980  -  10/1/1981 |
| LMI | SL3726 | 10/1/1980  -  10/1/1981 |
| LMI | SLC5747 | 10/1/1980  -  10/1/1981 |
| LMI | SL3731 | 10/1/1980  -  10/1/1981 |
| LMI | SLC5754 | 10/1/1980  -  10/1/1981 |
| LMI | SL3574 | 10/1/1981  -  10/1/1982 |
| LMI | SLC5630 | 10/1/1981  -  10/1/1982 |
| LMI | SL3606 | 10/1/1981  -  10/1/1982 |
| LMI | SLC5656 | 10/1/1981  -  10/1/1982 |
| LMI | SL3887 | 10/1/1981  -  10/1/1982 |
| LMI | SLC5894 | 10/1/1981  -  10/1/1982 |
| LMI | SL3888 | 10/1/1981  -  10/1/1982 |
| LMI | SLC5895 | 10/1/1981  -  10/1/1982 |
| LMI | SL4063 | 10/1/1982  -  9/1/1983 |
| LMI | SLC6043 | 10/1/1982  -  9/1/1983 |
| LMI | SL4065 | 10/1/1982  -  9/1/1983 |
| LMI | SLC6045 | 10/1/1982  -  9/1/1983 |
| LMI | SL4066 | 10/1/1982  -  9/1/1983 |
| LMI | SLC6046 | 10/1/1982  -  9/1/1983 |
| LMI | SL4063 | 9/1/1983  -  9/1/1984 |
| LMI | SLC6043 | 9/1/1983  -  9/1/1984 |
| LMI | ISL3125 | 9/1/1983  -  9/1/1984 |
| LMI | ICO4082 | 9/1/1983  -  9/1/1984 |
| LMI | ISL3114 | 9/1/1983  -  9/1/1984 |
| LMI | ICO4073 | 9/1/1983  -  9/1/1984 |
| LMI | SL4063 | 9/1/1984  -  9/1/1985 |
| LMI | SLC6043 | 9/1/1984  -  9/1/1985 |
| LMI | ISL3125 | 9/1/1984  -  9/1/1985 |
| LMI | ICO4082 | 9/1/1984  -  9/1/1985 |
| LMI | ISL3289 | 9/1/1984  -  9/1/1985 |
| LMI | ICO5133 | 9/1/1984  -  9/1/1985 |
| LMI | ISL3322 | 2/19/1985  -  9/1/1985 |
| LMI | ICO5162 | 2/19/1985  -  9/1/1985 |
| LMI | ISL3401 | 9/1/1985  -  9/1/1986 |
| LMI | ICO5239 | 9/1/1985  -  9/1/1986 |
| LMI | ISL3482 | 9/1/1985  -  10/22/1986 |
| LMI | ICO5326 | 9/1/1985  -  10/22/1986 |
| Royal | RLG 050000 | 10/1/1956  -  10/1/1957 |
| Royal | RLG 055000 | 10/1/1957  -  10/1/1958 |

| | | | | |
|---|---|---|---|---|
| Royal | RLG 059700 | 10/1/1958 | - | 10/1/1959 |
| Royal | RLG 000059 | 10/1/1959 | - | 10/1/1960 |
| Royal | RLG 001060 | 10/1/1960 | - | 10/1/1961 |
| Royal | RLG 001061 | 10/1/1961 | - | 10/1/1962 |
| Royal | RLG 001062 | 10/1/1962 | - | 10/1/1963 |
| Royal | RLG 001063 | 10/1/1963 | - | 10/1/1964 |
| Royal | RLX 100035 | 6/4/1964 | - | 6/4/1965 |
| Royal | RLG 001064 | 10/1/1964 | - | 10/1/1965 |
| Royal | RLX 100035 | 6/4/1965 | - | 6/4/1966 |
| Royal | RLG 001065 | 10/1/1965 | - | 10/1/1966 |
| Royal | RLX 100035 | 6/4/1966 | - | 6/4/1967 |
| Royal | RLG 604826 | 10/1/1966 | - | 10/1/1967 |
| Royal | RLA 100629 | 6/4/1967 | - | 6/4/1968 |
| Royal | RTG 604827 | 10/1/1967 | - | 10/1/1968 |
| Royal | RLA 100629 | 6/4/1968 | - | 6/4/1969 |
| Royal | RTG 604828 | 10/1/1968 | - | 10/1/1969 |
| Royal | RLA 100629 | 6/4/1969 | - | 6/4/1970 |
| Royal | RTG 604829 | 10/1/1969 | - | 10/1/1970 |
| Royal | RLA 101501 | 6/4/1970 | - | 10/1/1971 |
| Royal | RTG 604820 | 10/1/1970 | - | 10/1/1971 |
| Royal | RTG 604821 | 10/1/1971 | - | 10/1/1972 |
| Royal | RLA 101877 | 10/1/1971 | - | 10/1/1972 |
| Royal | PTG 604822 | 10/1/1972 | - | 10/1/1973 |
| Royal | PLA 102188 | 10/1/1972 | - | 10/1/1973 |
| Royal | PTG 604823 | 10/1/1973 | - | 10/1/1974 |
| Royal | PLA 102553 | 10/1/1973 | - | 10/1/1974 |
| Royal | PTG 604824 | 10/1/1974 | - | 10/1/1975 |
| Royal | PTQ 302591 | 10/1/1974 | - | 3/1/1975 |
| Royal | PTQ 302591 | 3/1/1975 | - | 10/1/1975 |
| Royal | PTG 604825 | 10/1/1975 | - | 10/1/1976 |
| Royal | PTQ 306461 | 10/1/1975 | - | 10/1/1976 |