COUGHLIN DUFFY LLP
Kevin T. Coughlin
Adam M. Smith
Karen H. Moriarty
Wall Street Plaza
88 Pine Street, 28th Floor
New York, New York 10005
phone: 212-483-0105
fax: 212-480-3899
Email: KCoughlin@coughlinduffy.com
	ASmith@coughlinduffy.com
	KMoriarty@coughlinduffy.com
*Counsel for Arrowood Indemnity Company,
formerly known as Royal Indemnity Company,
as successor by merger to Royal Insurance Company of America*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br><br> THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK, <br><br> Debtor. | Chapter 11 <br><br> Case No: 20-12345-scc |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK, <br><br>        Plaintiff <br><br> v. <br><br> ARROWOOD INDEMNITY COMPANY f/k/a Royal Insurance Company also f/k/a Royal Globe Insurance Company, et al., <br><br>        Defendants. | Adversary Proceeding No. 20-01227-scc |

**ARROWOOD INDEMNITY COMPANY'S OBJECTION TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO INTERVENE <u>IN ADVERSARY PROCEEDING NO. 20-01227</u>**

Arrowood Indemnity Company, formerly known as Royal Indemnity Company, as successor by merger to Royal Insurance Company of America ("Arrowood"), subject to and without waiving its right to seek to withdraw the reference, hereby objects (the "Objection")[1] to the Official Committee of Unsecured Creditors' (the "Committee") Motion to Intervene in Adversary Proceeding No. 20-01227 (Adv. Pro. 20-01227, Doc. No. 13) (the "Intervention Motion").

## I. INTRODUCTION

1. The Committee seeks an order permitting the right to "unconditionally" intervene in this Adversary Proceeding pursuant to 11 U.S.C. § 1109(b) of the Bankruptcy Code and Federal Rule of Civil Procedure 24(a) or (b), subject to certain limitations. See the Committee's proposed order submitted with the Intervention Motion (Adv. Pro. 20-01227, Doc. No. 13). Those suggested limitations, however, do not satisfy Arrowood's concerns and therefore Arrowood makes this objection.

2. The Committee was appointed on October 16, 2020, and, upon information and belief, consists solely of sexual abuse plaintiffs, their attorney and representatives (Case No. 20-12345; Doc. No. 71).

3. This Adversary Proceeding involves whether and to what extent Arrowood and certain other insurers may provide insurance coverage to The Roman Catholic Diocese of Rockville Centre, New York (the "Debtor") in connection with claims and lawsuits pending in the New York State Supreme Court alleging liability with regard to childhood sexual abuse by members of the clergy or other agents of the Debtor (the "Underlying Claims").[2]

---

[1] This objection is made without prejudice to or waiver of any of Arrowood's rights, claims or defenses at law or in equity.

[2] Certain parishes, schools and other affiliated entities, which are non-debtors and not parties to this Adversary Proceeding, also seek coverage from Arrowood in connection with the Underlying Claims. Unless otherwise noted, Arrowood refers to them collectively as "Non-Debtor Entities."

4. Prior to the Petition, the Debtor and Non-Debtor Entities requested coverage from Arrowood in connection with approximately 136 of the Underlying Claims. Arrowood is participating in the defense of the Debtor in all but nine (9) of those matters tendered, and in the defense of Non-Debtor Entities in approximately 80 of the matters tendered on behalf of the Non-Debtor Entities, subject to reservations of rights and requests for information ("RFIs") needed by Arrowood to fully evaluate the Debtor's requests for coverage.

5. Arrowood allegedly issued primary, excess and/or umbrella policies to the Debtor which were in effect at certain times from 1957 to 1976. (the "presumed Arrowood Policies"). The presumed Arrowood Policies do not provide coverage to the extent that, *inter alia*, any "bodily injury" was expected or intended from the standpoint of the insured. Moreover, New York insurance law precludes coverage for expected or intended harms. See, e.g., Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co., 98 N.Y. 2d 208, 220 (2002)("Insurance policies generally require "fortuity" and thus implicitly exclude coverage for intended or expected harms."); see also, Insurance Law § 1101 (a) (1) & (2).

6. The RFIs therefore seek information which would be in the Debtor's and/or Non-Debtor Entities' possession and control, including, in part:

- Any and all incident reports, condemnations, performance reviews, etc., prepared by the Debtor and/or Non-Debtor Entities in connection with the alleged abuser(s);

- The names of all priests, employees and agents of the Debtor and/or Non-Debtor Entities involved in any of the alleged sexual misconduct committed by each abuser or who have been alleged to have had knowledge of the alleged sexual misconduct;

- The names of all priests, employees and/or agents of the Debtor and/or Non-Debtor Entities who were suspended from service as a result of the alleged sexual misconduct at issue;

- All written guidelines, rules, manuals or other documents, whether formal or informal, concerning the Diocese's sexual abuse policy and the handling of sexual abuse claims; and

- The personnel files of the alleged abuser(s).

7. The RFIs also seek information which would be in the Debtor's and/or Non-Debtor Entities' possession and control with regard to their insurance policies and insurance program(s) with regard to the Underlying Claims at issue.

8. Prior to the Petition, the Debtor provided Arrowood with limited information related to its purported insurance policies and coverage position letters from other insurers. Despite continued follow-up, the Debtor has provided no other information in response to Arrowood's RFIs.

9. Arrowood requires the requested information in order to evaluate whether and to what extent it may owe coverage to the Debtor and/or Non-Debtor Entities in connection with the Underlying Claims. For example, the requested information will assist Arrowood in determining the existence and extent of the Debtor's and/or Non-Debtor Entities' knowledge regarding a particular alleged perpetrator's propensities and/or prior abuses such that the Debtor and/or Non-Debtor Entities may have expected or intended any injuries suffered by the plaintiffs.

10. Certain of the information needed by Arrowood to fully evaluate coverage may also inform whether the Debtor and/or Non-Debtor Entities are liable for some of or all of the causes of action alleged against them in the Underlying Claims including, but not limited to, whether the Debtor and/or Non-Debtor Entities negligently hired, trained, supervised and/or retained the alleged perpetrator.

11. The Committee, which upon information and belief is solely comprised of plaintiffs, plaintiffs' attorneys, and other representatives of the plaintiffs and claimants in the Underlying Claims, is a stranger to the presumed Arrowood Policies, is not in privity with Arrowood, and cannot pursue any direct claims against Arrowood under New York State law.

12. Should this Court grant the Committee's intervention request, based on the discovery Arrowood will need to seek to determine the applicability of any coverage under the presumed Arrowood Policies, the Committee will receive access to information that potentially may compromise the defenses of Arrowood's putative insureds (*i.e.*, the Debtor and/or Non-Debtor Entities) and may also potentially increase the Debtor's and/or Non-Debtor Entities' exposure to the Underlying Claims.

13. Should this Court grant the Committee's intervention, the Committee, as the representative of plaintiffs, will be granted rights that are prohibited under New York State law – the right to litigate insurance coverage issues before obtaining a judgment that remains unsatisfied.

14. Arrowood therefore respectfully requests that the Intervention Motion be denied to avoid the circumvention of well-established New York law that only permits an injured party to pursue claims against a defendant's insurer under limited circumstances not present here.

15. The Committee's request is further undermined by the Committee's failure to provide a pleading that sets out the claim or defense for which intervention is sought under Fed. R. Civ. P. 24(c).

16. As explained below, §1109(b) does not give the Committee the unilateral right to take ownership or control of the Debtor's legal causes of action. Importantly, the facts and law here are very different from the typical case where a committee seeks to intervene in an adversary proceeding.

## II. ARGUMENT

17. "A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate." In re Smart World Technologies, LLC, 423 F.3d 166, 175 n.12 (2d Cir. 2005)(emphasis added); see also, In re Adelphia Communs. Corp., 544 F.3d 420, 427 n.1 (2d Cir. 2008); In re Spiegel, 292 B.R. 748 (Bankr. S.D.N.Y. 2003)(citing Woods

5

v. City Nat'l Bank and Trust Co. of Chicago et al., 312 U.S. 262, 268-269 (1941); Westmoreland Human Opportunities, Inc. v. Walsh et al., 246 F.3d 233, 256 (3d Cir. 2001); In re PWS Holding Corp., 228 F.3d 224, 246 (3${}^d$ Cir. 2000)("11 U.S.C. § 1103(c) has been interpreted to imply … fiduciary duty to committee constituents …").

18. Although the Committee, in name, is known as the Official Committee of Unsecured Creditors, it is, in truth here based upon its composition, a "Tort Claimants Committee" standing for and representing those who hold the same type of interests. See, In re Boy Scouts of America, Official Committee of Tort Claimants, Case No. 20-10343; Doc. No. 142; see also, In re The Diocese of Camden, New Jersey, Official Committee of Tort Claimants, Case No. 20-21257; Doc. No 111.

19. The Committee argues that it has an unconditional right to intervene pursuant to Federal Rule of Civil Procedure 24(a)(1) because it qualifies as a party in interest under section 1109(b) of the Bankruptcy Code. The Committee also argues that even in the absence of that "absolute right," it is entitled to intervene under Fed. R. Civ. P. 24(a)(2) because the Debtor does not adequately represent its interests.

20. Lastly, the Committee argues it should be granted permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).

21. The Committee's arguments fail under Rule 24(a)(1), 24(a)(2) and 24(b)(1)(B).

    **a. The Committee is not entitled to intervention of right.**

22. Fed. R. Civ. P. 24(a), as adopted by Fed. R. Bankr. P. 7024, provides that a court must grant intervention of right in an adversary proceeding to anyone who:

> (1) is given an unconditional right to intervene by a federal statute; or
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's

ability to protect its interest, unless existing parties adequately represent that interest.

23. 11 U.S.C. § 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, *may* raise and *may* appear and be heard on any issue in a case under this chapter [11 USCS §§ 1101 et seq.]." (Emphasis added).

24. The Committee cites to <u>Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)</u>, 303 F.3d 161 (2d Cir. 2002) for the proposition that section 1109(b) "grants to all parties in interest – including creditors' committees – an *unconditional* right to intervene." The Committee, however, ascribes an overly broad interpretation to the holding in <u>In re Caldor</u>.

25. In <u>In re Caldor Corp.</u>, the Second Circuit was asked to consider a question of first impression in the Circuit - whether section 1109(b) confers on a party in interest an unconditional right to intervene in an adversary proceeding within the meaning of Fed. R. Civ. P. 24(a)(1). 303 F.3d at 166. The joint liquidators argued that section 1109(b) provided a party in interest with a right to be heard in the main bankruptcy case only and stated nothing about intervention in an adversary proceeding. <u>Id</u>. at 164. The Second Circuit disagreed and reversed both the district court and the bankruptcy court, finding that the phrase "'any issue in a case' plainly grants a right to raise, appear and be heard on any issue whether it arises in [the main bankruptcy case, in] a contested matter[,] or [in] an adversary proceeding." <u>Id</u>. at 169.

26. <u>In re Caldor</u>, however, is inapposite because it did not address the same set of facts present here; namely, a creditors committee comprised solely of plaintiffs' representatives who seek to intervene in an adversary proceeding addressing questions of insurance coverage for those plaintiffs' sexual abuse claims where controlling state law provides that such plaintiffs lack

7

standing to participate in cases to determine the extent and applicability of coverage. Indeed, In re Caldor does not address the issue of standing.

27. To intervene, in addition to establishing itself as a "party in interest" under section 1109(b), the proposed intervenor must establish Article III standing. See, In re Motors Liquidation Co., 430 B.R. 65, 92 (S.D.N.Y. 2010) ("[S]ection 1109(b) of the Bankruptcy Code does not satisfy or replace the constitutional and prudential limitations on standing."). Here, while the Committee argues that it must be permitted to intervene under section 1109(b) of the Bankruptcy Code, it fails to demonstrate that it also meets the constitutional and prudential limitations on standing. Article III of the Constitution limits the "judicial power" to the resolution of "cases" and "controversies," restricting the adjudicatory power of the federal courts to situations where the exercise of judicial power is "a necessity in the determination of real, earnest and vital controversy." Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982)(citing Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345, (1892)). The case or controversy requirement "ensures both that the legal issues presented to the court are sharpened by the presence of concrete adversity and that judicial review is sought by those who have a direct stake in the outcome." Oregon Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin., 860 F.3d 1228, 1233 (9th Cir. 2017)(citing Diamond v. Charles, 476 U.S. 54, 62 (1986)).

28. The Constitution does not recognize a difference between the original parties to a lawsuit and intervenors. See, Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1647-48 (2017)(holding that intervenors must have Article III standing). As set forth in In re Motors Liquidation Co.:

> "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004). In the bankruptcy context, the Court must assess whether an appellant has standing not just to raise a

8

general objection to an order, but whether appellant has standing to advance specific arguments in opposition to that order. Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.), 843 F.2d 636, 642-43 (2d Cir. 1988)(holding that, under the prudential standing doctrine, appellant had standing to raise only certain of his challenges to an order confirming a plan); see also, In re Quigley Co., 391 B.R. 695, 703-05 (Bankr. S.D.N.Y. 2008)(citing cases for proposition that the "court should decide questions of standing . . . on an issue-by-issue basis"). It is well settled that an "'irreducible constitutional minimum,' Article III standing requires that: (1) the plaintiff suffer an injury in fact; (2) the injury be fairly traceable to the challenged conduct; and (3) the injury will likely be redressed by a favorable decision from the court." [In re Chrysler LLC, 576 F.3d 108, 122 (2d Cir.), dismissed, 130 S. Ct. 41, 174 L. Ed. 2d 625, vacated 130 S.Ct. 1015, 175 L. Ed. 2d 614 (2009).]

430 B.R. at 92.

29. In a factually similar case, the court narrowly construed Rule 24(a)(1) in analyzing a committee's right to intervene in a coverage adversary proceeding. See, e.g., Catholic Bishop of Northern Alaska v. Continental Ins. Co., et al. (In re Catholic Bishop of Northern Alaska), Case No. F08-00110-DMD, Adversary No. F08-90019-DMD, Doc. 58[3] ("while 1109(b) appeared to create such a right when viewed in isolation, it had to be viewed in the context of Rule 24(a)(1)"), Exhibit A to the Declaration of Adam M. Smith (the "Smith Declaration"). These courts have been reluctant to interpret statutes to grant an unconditional right to intervene.

30. Catholic Bishop of Northern Alaska is instructive as it considered the same factual scenario as presented here. The court there focused on the fact that even if the Committee - the plaintiffs in the underlying sexual abuse claims – had an interest in whether there was coverage for their claims, state law proscribed the plaintiffs from maintaining a direct action against the

---

[3] The Pachulski Stang Ziehl & JoneS LLP firm also represented the Official Committee of Unsecured Creditors in the In re Catholic Bishop of Northern Alaska matter.

insurers. In re Catholic Bishop of Northern Alaska, Case No. F08-00110-DMD, Adversary No. F08-90019-DMD, Doc. 58 at pg. 6.

31. Similarly, under New York Insurance Law § 3420, an injured party cannot maintain a direct action against a tortfeasor's insurer until he/she has *first* obtained a judgment against the tortfeasor/insured, served the insurance company with a copy of the judgment and awaited payment for 30 days. See, 3420(a)(2) and (b)(1); see also, Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 354-55 (2004)(internal citation omitted)("Insurance Law § 3420 therefore grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances…Compliance with these requirements is a condition precedent to a direct action against the insurance company….").[4]

32. New York courts have specifically held that such claimants lack standing to pursue claims that have not resulted in an unsatisfied judgment. See, e.g., Nick's Garage, Inc. v. Liberty Mut. Fire Ins. Co., 991 N.Y.S.2d 695 (4th Dep't. 2014); Jimenez v. New York Cent. Mut. Fire Ins. Co., 897 N.Y.S.2d 143 (2d Dep't. 2010) ; see also, NAP, Inc. v. Shuttletex, Inc., 112 F. Supp. 2d 369, 376 (S.D.N.Y. 2000)(citations omitted)("Where an injured third party, prior to an adjudication of liability, institutes an action directly against an insurer which has disclaimed coverage and seeks to establish the insurer's obligation to defend and indemnify the insured, the actual controversy arises between the insurer and the insured. In this situation, a real possibility exists that any declaration of the rights and legal relations between the parties that the court renders may amount to an advisory opinion potentially grounded on standing that may not obtain or on a contingency that may not occur.")

---

[4] Insurance Law § 3420(a)(6) permits an injured plaintiff to commence a prejudgment against a tortfeasor's insurer "if the insurer disclaims liability or denies coverage based upon the failure to provide timely notice" but same applies only to policies issued or renewed after January 17, 2009. The Arrowood Policies were allegedly in effect between 1957 and 1976.

33. That the Debtor commenced a bankruptcy proceeding does not change the analysis. In fact, Insurance Law § 3420 was passed to provide injured parties with the ability to directly pursue satisfaction of a judgment obtained against a bankrupt or insolvent defendant from that defendant's insurance company, an ability which did not previously exist at common law. See, Lang, 3 N.Y.3d at 355-56 ("Far from supplying a reason for disregarding the statutory requirements, the bankruptcy or insolvency of an insured is precisely the situation Insurance Law § 3420 was intended to address.").

34. Here, there is no dispute that neither the Committee, nor the plaintiffs it represents have obtained any judgment(s) against the Debtor that have been presented to Arrowood for payment. Prior to the Petition, the Underlying Claims were in the early stages of litigation.

35. Thus, the Committee is also not entitled to intervention of right under 24(a)(2); specifically, though the Committee may have an interest with regard to insurance to cover the sexual abuse claims, it does not have a "protectable interest" within the context of this Adversary Proceeding because New York law does not permit a victim to maintain a direct action against the liability insurance company of the tortfeasor.

36. The Committee's failure to provide a pleading that sets out the claim or defense for which intervention is sought as required under Fed. Rule Civ. P. 24(c) is a tacit acknowledgement that it cannot assert any claims against Arrowood or the other insurers under New York Insurance Law § 3420.

37. Permitting the Committee to participate in this Adversary Proceeding is akin to permitting the Committee to seek insurance coverage, whether on its own or in conjunction with the Debtor. The limitations proposed by the Committee – and agreed to by the Debtor – do not alter this fact and only serve to demonstrate why the Committee should not be permitted to intervene in this Adversary Proceeding.

38. As indicated above, the information Arrowood has sought from the Debtor and Non-Debtor Entities to evaluate coverage in connection with the Underlying Claims may very well overlap with the information that could increase the Debtor's and/or the Non-Debtor Entities' exposure to those claims.

39. In fact, prior to filing the Petition, the Debtor refused to produce the majority of information requested by Arrowood, citing concerns that information provided to Arrowood may be discoverable to the underlying plaintiffs absent a confidentiality and common interest agreement. See, July 25, 2019 letter, Exhibit B to the Smith Declaration). The same concerns exist here and would be exacerbated if the Committee were permitted to intervene in the Adversary Proceeding.

40. Thus far, in fact, the Debtor has used the presence of the Committee as a basis to continue to withhold the information Arrowood needs to fully evaluate coverage. Having the Committee as a party in the coverage litigation will exacerbate this discovery problem.

41. Moreover, even if the Committee can claim an interest in the outcome of this coverage Adversary Proceeding, that interest is no more impaired or impeded than it would be under controlling New York law prohibiting a direct action against an insurer absent an unsatisfied judgment against an insured.

42. The court in Catholic Bishop of Northern Alaska rejected a similar argument made here by the Committee that there are conflicts between the interests of the Committee and the interests of the Debtor which "may result in conflicting litigation positions;" namely, the Debtor disputes the validity and value of the Underlying Claims and only has "incentive to recover only as much as it believes will be necessary to confirm a plan of reorganization, with or without the consent of the committee and creditors…" whereas the Committee has an interest in "maximizing the defendant insurers' coverage obligations." Case No. F08-00110-DMD, Adversary No. F08-

12
1864434

90019-DMD at pg. 8, Exhibit A to the Smith Declaration. Indeed, the court there acknowledged that an argument that the Debtor would seek less than "recovery of maximum policy limits, holds little water." Id.

43. The argument that the Committee has a greater interest in recovery than the Debtor is also not supported by New York Insurance Law. Even in the limited circumstances where it is permitted, an injured party's rights when taking direct action against an insurer are no greater than those of the tortfeasor/insured. See, West Ast. Props, LLC v. American State Ins. Co., 2014 N.Y.Misc.LEXIS 5871, at * 9 (Sup. Ct. Westchester Cty Oct. 3, 2014) (citing D'Arata v. New York Cent. Mut. Fire Ins. Co., 76 N.Y.2d 659, 665 (1990)("It is well-settled that in taking direct action against an insurer, the injured party steps into the shoes of the insured, and has only those rights that the insured would have under the insurance policy").

### b. Any permitted intervention should be limited.

44. If the Court determines intervention by the Committee is warranted here, the scope of the Committee's rights should be limited. See, In re Smart World, 423 F.3d 166; In re Adelphia Communs Corp., 285 B.R. 848 (Bankr. S.D.N.Y. 2002); see also, In re Financial Oversight and Management Board for Puerto Rico, 872 F.3d 57 (1st Cir. 2017). In Smart World, the Second Circuit held a Committee's intervention does not include the right to settle the proceeding or take control of the estate's legal causes of action. Smart World, 423 F.3d at 182. Similarly, in Adelphia, the Court noted it could limit discovery requests by a Committee and/or require such requests to be coordinated with other requests made by the parties to the adversary proceeding. Adelphia, 285 B.R. at 858. More recently, in Puerto Rico, the First Circuit explained that a court has discretion to limit the participation of intervenors in many ways, including prohibiting an intervenor from precluding other parties to settle their own disputes or a particular set of issues, restricting

13

intervention to "the claims brought by the original parties," and/or denying discovery where appropriate. Puerto Rico, 872 F.3d at 64-65.

45. Finally, there is no absolute right of the Committee to intervene because the Committee, albeit named the "Official Committee of Unsecured Creditors," is, upon information and belief, comprised solely of individuals with claims sounding in alleged sexual abuse, and does not represent the interests of all unsecured creditors, nor does it owe a fiduciary duty to all unsecured creditors in bankruptcy proceeding. As such, the Committee is more akin to a Tort Claimants Committee (as have been formed in numerous other Diocesan bankruptcy cases).

### c. The Court should not grant permissive intervention to the Committee.

46. This Court should also deny permissive intervention to the Committee under Fed. R. Civ. P. 24(b)(1)(B).

47. Fed. R. Civ. P. 24(b)(1)(B) provides:

> (1) *In General.* On timely motion, the court may permit anyone to intervene who:
>
> * * * *
>
> (B) has a claim or defense that shares with the main action a common question of law or fact.

48. The Committee argues that its claims "share common questions of law and fact with the Debtor's claims" in that they "both seek resolution of whether the policies issued by the defendant insurance companies cover the [Underlying Claims]." Motion at ¶ 25.

49. First, it is not clear to what "claims" the Committee refers since it did not attach a pleading which sets out the claim or defense for which intervention is sought as required under Fed. R. Civ. P. 24(c).

1864434

50. The court in In re Catholic Bishop of Northern Alaska "refuse[d] to allow permissive intervention…because Alaska law does not allow a tort claimant to directly sue the tortfeasor's insurer." Case No. F08-00110-DMD, Adversary No. F08-90019-DMD at pg. 7.

51. Moreover, Fed. R. Civ. P. 24(b)(3) provides that "in exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."

52. In this regard, the Committee argues that its presence in this Adversary Proceeding "will likely lead to a *quicker* resolution of the dispute because if settlement negotiations occur, the Committee will be in a far better position to understand the case, and evaluate any settlement offers, if it is actively involved in the Adversary Proceeding." Motion at ¶ 26.

53. This statement only serves to demonstrate the prejudice to Arrowood if the Committee is permitted to intervene. For example, if the Committee were permitted to be involved with any settlement offers or negotiations in connection with the coverage dispute, Arrowood would face pressures from a party or parties who are strangers to its insurance policies and to whom it owes no obligations.

1864434

### III. **CONCLUSION**

For the foregoing reasons, Arrowood respectfully submits that this Court should deny intervention of right and permissive intervention to the Committee under Federal Rule of Civil Procedure 24 and Bankruptcy Law section 1109(b).

Dated: December 2, 2020
      New York, New York

Respectfully submitted,

COUGHLIN DUFFY LLP

/s/ *Adam M. Smith*

Kevin T. Coughlin
Adam M. Smith
Karen H. Moriarty
Wall Street Plaza
88 Pine Street, 28th Floor
New York, New York 10005
Phone: 212-483-0105
Fax: 212-480-3899
E-mail: KCoughlin@coughlinduffy.com
      ASmith@coughlinduffy.com
      KMoriarty@coughlinduffy.com
*Counsel for Arrowood Indemnity Company, formerly known as Royal Indemnity Company, as successor by merger to Royal Insurance Company of America*

PORZIO, BROMBERG & NEWMAN, P.C.
Brett S. Moore
Robert M. Schechter
156 West 56th Street. Suite 803
New York, NY 10019-3800
Phone: (212) 265-6888
Fax:    (212)957-3983
E-mail:    bsmoore@pbnlaw.com
      rmschechter@pbnlaw.com
*Co-Counsel to Arrowood Indemnity Company f/k/a Royal Insurance Company and f/k/a Globe Insurance Company*

1864434